# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| PROVITAS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:21-CV-00196 |
| v. | § | Judge Mazzant |
| | § | |
| QUALITY INGREDIENTS | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Amended Motion to Dismiss, Or In The Alternative, For Transfer Pursuant To 28 U.S.C. § 1404 (Dkt. #16).[1]  Having considered the motion and the relevant pleadings, the Court finds that it should be **DENIED in part** and **GRANTED in part**.

## BACKGROUND

This case arises out of a business relationship between the plaintiff, Provitas, LLC ("Provitas"), the defendant, Quality Ingredients Corporation ("QIC"), and non-party, DSM Nutritional Products, LLC ("DSM") (Dkt. #1). This is the fourth lawsuit involving these parties, each stemming from a batch of plant-based powder manufactured by QIC that was allegedly contaminated with animal products (Dkt. #16 at p. 2).

Provitas is a Texas based corporation "that supplies oil-soluble vitamins and nutrients to end-user-product producers in the food, dietary supplement, and personal care products industries" (Dkt. #1 ¶ 18). QIC is a Minnesota based corporation "that takes raw ingredients provided by its

---

[1] The original Motion to Dismiss (Dkt. #8) is identical to the Amended Motion to Dismiss (Dkt. #16) sans four missing pages at the end of the motion. The Amended Motion to Dismiss includes the full 18 pages that Defendant intended to include at the outset (Dkt. #16 at p. 1).

customers" and "mixes them per the customer's specifications into liquid slurries which are then dried into powders" (Dkt. #16 at p. 3). DSM is an end-user-product producer incorporated in Delaware (Dkt. #8 Ex. 9). In early 2014, Provitas was interested in exploring a business relationship with QIC, and the two parties subsequently entered into a Mutual Confidentiality Agreement (the "Agreement") (Dkt. #13 Ex. A-1).

The Agreement created the initial relationship between the parties but left open the possibility for QIC and Provitas to enter into subsequent agreements that would subject them to additional commitments (Dkt. #13 Ex. A-1 ¶¶ A–B). However, the Agreement contained a clause indicating that future transactional agreements would be "conditional upon and subject to the terms of" the initial Agreement (Dkt. #13 Ex. A-1 ¶ C). Notably, the Agreement also contained a choice of law provision—indicating Minnesota law would govern interpretation of the Agreement—and a forum selection clause binding the parties to adjudication in Minnesota under particular circumstances (Dkt. #13 Ex. A-1 ¶ 12).

One particular subsequent transaction is at issue here. On May 18, 2017, Provitas placed an order with QIC for Vitamin D2 and Vitamin D3 powders to fulfill an order placed by DSM (Dkt. #16 at p. 3). Provitas supplied QIC with liquid Vitamin D2 and D3, starch, and malto dextrin (Dkt. #16 at p. 3). It also "provided the specific formulation, cleaning protocols, and sequencing to be utilized" in processing the raw materials (Dkt. #16 at p. 4). The Vitamin D2 was mixed and dried at the QIC facility in Minnesota in accordance with these protocols, "which required the manufacturing of Vitamin D3 before the manufacture of Vitamin D2 with only a dry clean between" (Dkt. #16 at p. 4). QIC then "processed the liquid Vitamin D2 into the dry Vitamin D2 product, packaged the dry Vitamin D2 powder that it had produced in plastic lined cardboard boxes, labeled the boxes, and shipped the boxes" to Provitas at its facility in Prosper, Texas (Dkt.

2

#1 ¶ 24). This is the typical chain of events that Provitas carries out when its customers order a Vitamin D2 or D3 powder to add to their food product (Dkt. #1 ¶ 21).

Upon receipt of the shipment, Provitas, "without opening or otherwise tampering with the packaged powder manufactured by QIC," subsequently shipped these products to DSM's facilities in New York and Ontario (Dkt. #16 at p. 4). "DSM alleges that it received the Vitamin D2 powder supplement and integrated the dry Vitamin D2 powder manufactured by QIC into 106,000 kilograms of vegan soy milk product" (Dkt. #1 ¶ 26). Afterwards, DSM complained to Provitas that the vegan soy milk had been contaminated by Vitamin D3, an animal product (Dkt. #1 ¶ 27). DSM alleges "that because the Vitamin D2 contained an animal by-product, the soy milk was not marketable and had to be destroyed" (Dkt. #1 ¶ 27).

Provitas tested its own liquid Vitamin D2 and found no defect (Dkt. #1 ¶ 28). It concluded that any contamination in the end product could only have occurred as a result of QIC's manufacturing (Dkt. #1 ¶ 28). On March 26, 2020, Provitas brought an action against both QIC and DSM in the United States District Court for the District of Minnesota (Dkt. #16 at p. 2). But on June 5, 2020, Provitas filed a Notice of Voluntary Dismissal without prejudice (Dkt. #16 at p. 2). On March 27, 2020, DSM commenced an action based on the same or similar facts in the District of New Jersey, and that court signed a Stipulation of Dismissal on April 15, 2020 (Dkt. #16 at p. 2). Then, on April 27, 2020, DSM filed a complaint in the Northern District of New York against Provitas seeking economic damages for the losses incurred by the allegedly contaminated soy milk (Dkt. #16 at p. 2). Provitas filed a Third Party Complaint against QIC, and QIC filed a motion to dismiss the complaint for lack of personal jurisdiction (Dkt. #16 at p. 3). The Northern District of New York granted this motion (Dkt. #16 at p. 3).

On March 12, 2021, Provitas filed its complaint with the undersigned Court (Dkt. #1). QIC filed its Motion to Dismiss on April 15, 2021 (Dkt. #8), and Provitas responded on May 7, 2020 (Dkt. #13). On May 21, 2021, QIC filed its reply (Dkt. #14. On May 28, 2021, Provitas filed a sur-reply (Dkt. #17). The Court ordered supplemental briefing (Dkt. #29) on whether QIC had waived one of the arguments in its reply brief; the parties responded on November 23, 2021 (Dkts. #30, #31).

## LEGAL STANDARD

When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d 681, 683 n.3 (5th Cir. 1977). Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 161, 1067 (5th Cir. 1992)).

## ANALYSIS

### I.    Personal Jurisdiction

QIC asks this Court to dismiss Provitas' claims under Federal Rule of Civil Procedure 12(b)(2). This rule requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 202 (5th Cir. 1989)). To satisfy that burden, the party seeking to

invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cinega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *Id.*

It is undisputed that the Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992). Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion*, 895 F.2d at 216. The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts with a forum state can be satisfied by contacts that give rise to either general jurisdiction or specific jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

Provitas contends that QIC has established sufficient minimum contacts in Texas through its ongoing business relationship with Provitas, continued presence at Texas tradeshows, product deliveries to Texas, and its role as a food-products manufacturer (Dkt. #13 ¶ 19). Accordingly, Provitas alleges this Court has both general and specific jurisdiction over QIC (Dkt. #13 ¶ 19).

QIC argues that Provitas fails to allege general jurisdiction in its Complaint—and therefore cannot assert it in its response—but that in any circumstance, this Court has neither general nor specific jurisdiction over QIC for three reasons: 1) Provitas fails to establish that its claims arise out of QIC's contacts with Texas; 2) QIC's contacts with Texas are minimal; and 3) the exercise of personal jurisdiction would be neither fair nor reasonable (Dkt. #16 at pp. 9–11). Provitas responds in opposition to each of QIC's points and asks this Court to grant Provitas leave to amend its Complaint so that it may allege general jurisdiction (Dkt. #17 at p. 8).

### A.  General Jurisdiction

General jurisdiction exists only when the defendant's contacts with the forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see Cent. Freight Lines v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citing *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414, n.8 (1984)). Substantial, continuous, and systematic contact with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1992) (citation omitted). However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 609 (citing *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 596 (5th Cir. 1999)).

The Court need not grant Provitas leave to amend its Complaint for the purpose of allowing it to allege general jurisdiction. Leave to amend should be granted under Federal Rule of Civil Procedure 15(a) only "if it appears at all possible that the plaintiff can correct the defect." FED. R. CIV. P. 12(b)(2); 2 MOORE, FEDERAL PRACTICE, § 15.10 at 838 (2d ed. 1948). Correction to the defect is not possible here. The alleged facts, taken as true and in the light most favorable to Plaintiff, are insufficient to meet the high standard necessary for the Court to exercise general jurisdiction over QIC.

QIC's principal place of business and place of incorporation is Minnesota (Dkt. #16 at p. 11). It has no offices, officers, or employees in Texas; has never recruited Texas residents; has never maintained a Texas mailing address or telephone number; and has not appointed an agent for service in Texas. Even if, as Provitas alleges, QIC advertises in Texas and maintains business relationships with Texas companies (in addition to Provitas), this is not enough to "render [QIC] essentially at home" in Texas. *Daimler*, 571 U.S. at 127. Accordingly, the Court moves to its specific jurisdiction analysis.

## B. Specific Jurisdiction

QIC argues this Court lacks specific jurisdiction because QIC has not purposely directed any activities at Texas by merely placing products into the stream of commerce that arrived in Texas at some point (Dkt. #16). Accordingly, QIC argues, there is no relationship between it, the forum, and the litigation that would create the requisite contacts for the Court to exercise personal jurisdiction (Dkt. #16). Provitas contends that personal jurisdiction is proper under a stream of commerce theory. Specifically, it argues that it "need only show that [QIC] placed the product in the stream of United States commerce and made no attempt to limit its sale in Texas" (Dkt. #13 ¶ 23). Because the Fifth Circuit applies the less stringent "mere foreseeability or awareness" stream

of commerce analysis, the Court finds Provitas has made a prima facie case to support specific jurisdiction.

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros*, 466 U.S. at 414, n.8. Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). (citing *Travelers Health Ass'n. v. Virginia*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id*. For the court to exercise specific jurisdiction, the court must determine "(1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King*, 471 U.S. at 475).

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).  In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477. Nonetheless, "[i]t is rare to say the assertion of

jurisdiction is unfair after minimum contacts have been shown." *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

### 1. Purposeful Availment

A defendant establishes minimum contacts with a state if "the defendant's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474 (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). There must be some act whereby the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 475. A nonresident "may permissibly structure his primary conduct so as to avoid being haled into court in a particular state." *World–Wide Volkswagen*, 444 U.S. at 297. However, "even when a defendant has no physical presence in the forum state, a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact." *Nuovo Pignone*, 310 F.3d at 379.

Regarding interstate contractual obligations, the Supreme Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 474 (quoting *Travelers Health*, 339 U.S. at 647. *See also McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222–23 (1957). The Supreme Court has held generally that the stream of commerce theory provides a valid basis for establishing minimum contacts. *See World–Wide Volkswagen*, 444 U.S. at 297–98. "The forum does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that

delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.*

In *Asahi Metal Industry Co. v. Superior Court*, however, the Supreme Court split as to the precise application of the stream of commerce theory.  480 U.S. 102, 112, (1987)). Justice Brennan, concurring in the judgment, concluded that "[m]ere placement in the stream of commerce is sufficient" for specific jurisdiction.  *Id.* at 112, 116 (Brennan, J., concurring). For Justice Brennan, the "stream of commerce refers . . . to the regular and anticipated flow of products from manufacture to distribution to retail sale," and due process is not offended "as long as a [defendant] . . . is aware that the final product is being marketed in the forum state." *Id.* at 116–17. Justice O'Connor, writing for a plurality of the Court, would have required more. Specifically, Justice O'Connor reasoned that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112.

The Fifth Circuit, recognizing the Supreme Court's conflicting stream-of-commerce precedent, has interpreted *World–Wide Volkswagen* to hold that "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993) (quoting *Asahi*, 480 U.S. at 111. It rejects the *Asahi* plurality's assertion that more is required. *Id.* A defendant satisfies mere foreseeability or awareness when it introduces products into the stream of commerce but does not control the distribution system. *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081 (5th Cir. 1984).

Under the "mere foreseeability" stream of commerce analysis, Provitas has plausibly alleged that QIC purposefully availed itself of the privileges accompanied with its business conduct in Texas. QIC argues, given the nature of its business, it did not know where the product

would ultimately be consumed, so it could not have foreseen the product would be consumed in Texas (Dkt. #16 at p. 10). This assertion does not comport with the established Fifth Circuit analysis, and it conflicts with Provitas' Complaint. *Nuovo Pignone*, 310 F.3d at 380 (finding that defendant, "[a]s a voluntary member of the economic chain that brought the [product] to Louisiana, purposely has availed itself of the privilege of conducting business in that state"). It is not enough for QIC to claim unawareness of the final destination of its product. Because it shipped its product via the stream of commerce to a Texas-based company, QIC was on notice that its product would arrive in Texas. Further, QIC took no steps to control the final destination of its product, so QIC was unaware that the product it shipped to Texas "would have any final destination other than Texas" (Dkt. #13 at p. 12).

Even if QIC's unawareness of the product's final destination were enough, the Court at this stage accepts as true the facts alleged in the well-pleaded complaint; Provitas alleges that a QIC representative previously admitted QIC's purposeful business activities were directed at Texas, and that QIC shipped soluble vitamin powders to Texas where QIC expected them to be consumed (Dkt. #1 ¶ 13). Thus, Provitas has plausibly alleged that QIC "reach[ed] out beyond [Minnesota] and create[d] continuing relationships and obligations with citizens of [Texas]." *Burger King*, 471 U.S. at 474. Consequently, QIC is "subject to regulation and sanctions in [Texas] for the consequences of [its] activities." *Id.*

### 2.  Cause of Action Arising from Contacts

Due process requires, in addition to purposeful availment, that "the litigation results from alleged injuries that 'arise out of or relate to'" the activities associated with the availment. *Id.* at 472–73 (quoting *Helicopteros*, 466 U.S. at 414). Provitas contends that the causes of action it brings against QIC arise from QIC's contacts with Texas (Dkt. #1 ¶ 14). But QIC asserts the "suit-

related conduct and the basis of [the] claims involve the mixing of vitamins at [QIC]'s facility in Minnesota" (Dkt. #16 at p. 10). The Court finds Provitas has plausibly alleged the sufficient nexus required for specific jurisdiction.

Specific jurisdiction is proper over a nonresident defendant only when a "sufficient nexus" exists "between the [defendant]'s contacts with the forum and the cause of action." *Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Helicopteros*, 466 U.S. at 414, n.8). Under this prong, courts focus on "the relationship among the defendant, the forum, and the litigation." *Shaffter v. Heitner*, 433 U.S. 186, 204 (1977). That the defendant acts extensively in the forum is not sufficient to establish jurisdiction; rather, specific jurisdiction is only proper when the defendant's activities in the forum state are connected to the plaintiff's claims. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017).

The claims here so relate. QIC and Provitas have maintained ongoing business relationships by which QIC has sent numerous orders to the Provitas facility in Texas (Dkt. #1 ¶ 16). This cause of action arises out of and relates to an allegedly contaminated order of vitamin powders that QIC shipped to Provitas in Texas to satisfy Provitas' purchase order (Dkt. #1 ¶ 14). Therefore, the Court finds Provitas has alleged facts that plausibly create the sufficient nexus under this prong.

### 3.  Fair and Reasonable

"Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Nuovo Pignone*, 310 F.3d at 380 (citing *Wien Air Alaska*, 195 F.3d at 215). The defendant must make a "compelling case," *Burger King*, 471 U.S. at 477, because "it is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." *McFadin*, 587

F.3d at 759–60 (quoting *Wien Air Alaska*, 195 F.3d at 215). As mentioned, *supra* p. 8, a court analyzes five factors in deciding whether exercise of personal jurisdiction over a nonresident defendant is fair and reasonable. However, these "considerations usually may be accommodated through means short of finding jurisdiction unconstitutional"—for example, "a defendant claiming substantial inconvenience may seek a change of venue." *Burger King*, 471 U.S. at 477.

The Court finds that the considerations under the fair and reasonable inquiry may be accommodated through a change of venue. Accordingly, the Court finds it has specific, personal jurisdiction over QIC. The Court addresses below why this case must be transferred.

## II.    12(b)(3) Improper Venue

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action for "improper venue." FED. R. CIV. P. 12(b)(3). Once a defendant raises improper venue by motion, "the burden of sustaining venue will be on [the] Plaintiff." *Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.*, No. 1:07-CV-699, 2008 WL 686156 at *5 (E.D. Tex. Mar. 6, 2008). "Plaintiff may carry this burden by establishing facts that, if taken to be true, establish proper venue." *Id.* (citations omitted). The court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685 at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)). In determining whether venue is proper, "the Court may look beyond the complaint to evidence submitted by the parties." *Ambraco*, 570 F.3d at 238. If venue is improper, the court must dismiss, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); FED. R. CIV. P. 12(b)(3).

When a party challenges venue, the court must determine whether the plaintiff brought the action in a district outlined in one of 28 U.S.C. § 1391(b)'s three categories: (1) "a judicial district

in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) a district within the "fallback option." *Atl. Marine Const. Co. v. U.S. Dist. Ct. W. Dist. of Tex.*, 571 U.S. 49, 56 (2013). This fallback option is triggered "if there is no district in which an action may otherwise be brought as provided in this section" and allows "any judicial district in which any defendant is subject to the court's personal jurisdiction" to be considered a proper venue. § 1391(b)(3).

If the plaintiff can establish the action falls into one of these categories, venue is proper in that district; if the plaintiff cannot, venue is improper in that district, and the Court must dismiss the case or transfer it pursuant to § 1406(a) or § 1404(a), respectively. *Id.* Importantly, the presence of a forum selection clause in the parties' agreement giving rise to the transaction is irrelevant for purposes of determining whether venue is proper under § 1391(b). *Id.*[2] As a result, "a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Id.*

QIC argues this Court should dismiss the case for improper venue because this case does not fall within any of the § 1391(b) categories. Specifically, it asserts QIC does not reside in the Eastern District of Texas, the substantial part of the events giving rise to the claims arose in Minnesota, and Provitas has previously stated that all factors point to the District of Minnesota as the proper venue for this case (Dkt. #16, pp. 11–13).[3] Provitas responds that venue is proper under

---

[2] *See also, e.g.*, *Atl. Marine*, 571 U.S. at 59 (indicating the proper way to enforce a mandatory forum selection clause that points to another federal judicial district is by a motion to transfer under 28 U.S.C. 1404(a), not by a motion to dismiss under 28 USC 1406(a) or FRCP 12(b)(3)); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring) (holding § 1404(a) mandates that valid forum selection clauses be given "controlling weight in all but the most exceptional cases").

[3] The Court discusses this *infra* p. 7.

both (b)(1) and (b)(2).[4] It claims that, under § 1391(c), QIC is a resident of the Eastern District of Texas and that the substantial part of the events giving rise to its claims arose in this district (Dkt. #13 ¶¶ 38–42).

The Court finds that the Eastern District of Texas is a proper venue under § 1391(b)(1). Under § 1391(c), a corporate defendant is deemed to reside in any judicial district in which the defendant is subject to personal jurisdiction. In a state with multiple districts such as Texas, the question is whether the defendant would be subject to personal jurisdiction in the district where the action was filed, assuming the district was a separate state. § 1391(d). As previously discussed, Provitas has made a prima facie showing that this Court may exercise personal jurisdiction over QIC based on its contacts with Texas. Specifically though, the requisite minimum contacts arise from QIC's business relationship with Provitas—a corporation with its principal place of business in the Eastern District of Texas. For this, the Court finds QIC would be subject to this Court's personal jurisdiction, assuming the Eastern District of Texas was a separate state. Accordingly, QIC "resides" in this district for venue purposes. Venue is proper.

Having determined Provitas made a prima facie case allowing this Court to exercise personal jurisdiction, and finding that venue is proper under § 1391(b)(1), the Court denies QIC's Motion to Dismiss (Dkt. #16). The Court now addresses QIC's alternative motion for transfer under 28 U.S.C. § 1404(a).

### III.    Section 1404(a) Motion to Transfer

Section 1404 to Chapter 28 of the United States Code permits a district court to transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  This section "is

---

[4] Though Provitas did not allege the (b)(1) argument in its complaint, the Court may look beyond the complaint for venue purposes. *Ambraco*, 570 F.3d at 238.

intended to place discretion in the district court to adjudicate motions for transfer according to 'an individualized, case-by-case consideration of convenience and fairness.'" *Stewart*, 487 U.S. at 29 (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The purpose of § 1404 "is to prevent the waste 'of time, energy and money' and 'to protect the litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen*, 376 U.S. at 616 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 27 (1960)).

The threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties consent to a particular jurisdiction. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). In the typical § 1404(a) analysis, once that threshold inquiry is met, the district court weighs the relevant public and private factors and decides whether, on balance, a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice." *Id.* The private factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Id.* The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the interest in having localized issues decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.* A court also gives some weight to the plaintiff's choice of forum. *Atl. Marine*, 571 U.S. at 62, n.6.

However, "[t]he existence of a mandatory, enforceable [forum selection clause] dramatically alters this analysis." *Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 916 (W.D. Tex. 2016). This is primarily because "a forum-selection clause . . . may have figured

centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms." *Atl. Marine*, 571 U.S. at 66. In fact, it may "have been a critical factor in their agreement to do business together in the first place." *Id.* As such, "when parties have contracted in advance to litigate disputes in a particular forum," district courts should adjust their usual § 1404(a) analysis in three ways so as not to "not unnecessarily disrupt the parties' settled expectations." *Id.* at 66–67.

First, the plaintiff's choice of forum "merits no weight"; rather, the plaintiff has the burden of establishing that § 1404(a) transfer is unwarranted. *Id.* Second, the court will not consider the private-interest factors. Because the parties have contracted for a specific forum, they "waive the right to challenge the preselected forum as inconvenient." *Id.* at 64. Instead, the court considers only the public-interest factors. *Id.* "Because those factors will rarely defeat a transfer motion, the practical result is that forum selection clauses should control except in unusual cases." *Id.* Cases in which the public-interest factors are sufficiently strong to outweigh a valid forum selection clause "will not be common." *Id. See also Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767 (5th Cir. 2016).

### A.  Whether the District of Minnesota Would Have Been a Proper Venue

As mentioned, the threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *Volkswagen I*, 371 F.3d at 203. This requires the court to conduct a proper venue analysis under § 1391(b). Under § 1391(b)(1), venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" § 1391(b)(1).

QIC is the sole defendant in this matter. It maintains its principal place of business in Minnesota, where it is also incorporated (Dkt. #16 at p. 11). Provitas does not dispute this. Thus, QIC resides in the District of Minnesota, and, accordingly, that district would have been a proper venue for this matter. § 1391(b)(1).

## B.  Waiver of the Forum Selection Clause

Prior to addressing the forum selection clause, the Court must determine whether QIC waived its rights under the clause or waived its opportunity to raise the argument. Provitas claims that QIC did not raise the forum selection clause argument until its reply brief, thereby waiving it as a matter of both substance and procedure (Dkt. #30). QIC asserts that it did not waive its right to invoke the forum selection clause and did not procedurally waive the argument because the clause was within the scope of Provitas' response brief (Dkt. #31). Alternatively, QIC argues that if it did procedurally waive the argument, the Court should still consider the argument because Provitas had the opportunity—and used that opportunity—to fully respond (Dkt #31). The Court will discuss both the substantive and procedural waiver arguments.

### 1.  Waiver Legal Standard

In the context of forum selection clauses, the Fifth Circuit has noted "[t]here is a lack of authority determining whether federal or state law principles control the standard for determining a party's waiver of rights under a forum selection clause." *Hampton v. Equity Tr. Co.*, 736 F. App'x 430, 434–35 (5th Cir. 2018) (quoting *Wellogix, Inc. v. SAP Am., Inc.*, 648 F. App'x. 398, 401 (5th Cir. 2016) (unpublished)). Similarly, the Fifth Circuit has not yet settled on a single approach for assessing whether a party has waived its rights under a forum selection clause. *Id.*

One approach is a traditional inquiry that asks whether a party "intentionally or voluntarily relinquished its rights under the clause," *Wellogix*, 648 F. App'x. at 401, which requires "(1) an

existing right, benefit, or advantage; (2) actual or constructive knowledge of its existence; and (3) actual intent to relinquish that right." *SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Europe GmbH*, 839 F.3d 422, 426 (5th Cir. 2016) (quoting *GP Plastics Corp. v. Interboro Packaging Corp.*, 108 F. App'x. 832, 836 (5th Cir. 2004)). "Waiver can also occur if a party engages in 'conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.'" *Id.* (quoting *N. Am. Specialty Ins. Co. v. Debis Fin. Servs. Inc.*, 513 F.3d 466, 470 (5th Cir. 2007)).

The Fifth Circuit has also recognized "[a] second line of authority, articulating both federal and Texas law, [which] would apply essentially the test used by federal courts to assess waiver of arbitration clauses"—"a species of forum selection clause[s]." *Wellogix*, 648 F. App'x. at 401. "Under the second approach, 'the party to the forum selection clause waives its right if it (1) substantially invokes the judicial process in derogation of the forum selection clause and (2) thereby causes detriment or prejudice to the other party.'" *Hampton*, 736 F. App'x at 435 (quoting *SGIC Strategic*, 839 F.3d at 426); *accord In re ADM Inv'r Servs.*, 304 S.W.3d 371, 374 (Tex. 2010). "To invoke the judicial process, a 'party must, at the very least, engage in some overt act in court that evinces a desire to resolve the . . . dispute through litigation.'" *In re Mirant Corp.*, 613 F.3d 584, 589 (5th Cir. 2010) (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999)). Notably, the Fifth Circuit does not consider "filing a mere 'perfunctory motion to dismiss'" a substantial invocation of the judicial process. *Id.* (quoting *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995)); *see also In re ADM*, 304 S.W.3d at 374 ("Simultaneously filing an answer and motion to transfer venue with a motion to dismiss falls short of substantially invoking the judicial process to [plaintiff's] detriment or prejudice.").

As a matter of procedure, "[g]enerally, neither this court nor the district courts of this circuit will 'review arguments raised for the first time in [a] reply brief.'" *RedHawk Holdings Corp. v. Schreiber Tr. of Schreiber Living Tr.*, 836 F. App'x 232, 235 (5th Cir. 2020) (quoting *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)); *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (district court following the "court's practice of declining to consider arguments raised for the first time in a reply brief"). "On occasion, however, a district court may consider arguments and evidence raised for the first time in a reply brief without abusing its discretion 'so long as it gives the non-movant an adequate opportunity to respond prior to a ruling.'" *RedHawk*, 836 F. App'x at 235 (quoting *Thompson v. Dall. City Attorney's Office*, 913 F.3d 464, 471 (5th Cir. 2019) (internal citations omitted)). To be sure, "[t]he court has discretion to consider issues in the reply brief in certain circumstances . . . including when the new issue is raised in the nonmovant's brief and the movant responds to that issue in the reply." *Dean v. Cty.*, No. H-13-00073, 2013 WL 2452673, at *10 (S.D. Tex. June 5, 2013) (citing *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 905 F.2d 840, 854 (5th Cir. 1990)).

### 2.  Waiver Analysis

Provitas argues that QIC waived its forum selection clause rights under both Fifth Circuit approaches. Specifically, QIC's conduct in filing a lengthy motion to dismiss with no mention of the forum selection clause was so inconsistent with the intent to enforce the right that QIC relinquished it (Dkt. #30). Additionally, Provitas contends that QIC "has engaged in extensive discovery[,] . . . taken [] depositions," presented four different QIC employees for Provitas to depose, and "engaged in motion and stipulation practice relating to expert discovery and

mediation" (Dkt. #30 at p. 5). Thus, "QIC's conduct has caused all parties, including Provitas, to spend significant time and money on this litigation" (Dkt. #30 at p. 5).

QIC asserts it "has not substantially invoked the judicial process, and Provitas is not prejudiced by QIC's delay, if any, of seeking to enforce the forum selection clause" (Dkt. #31 at p. 7). QIC further contends it has only engaged in the judicial process to the level required by the Court's scheduling order while it awaits disposition of its Motion to Dismiss.

The Court finds that QIC did not waive its right to enforce the forum selection clause under either approach articulated by the Fifth Circuit. First, QIC has not "intentionally or voluntarily relinquished its rights under the clause." *Wellogix*, 648 F. App'x. at 401. At no point has QIC engaged in "conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *SGIC Strategic*, 839 F.3d at 426. As QIC correctly notes, just one month after Provitas filed its complaint "QIC filed a Motion to Dismiss arguing that the District of Minnesota was the proper venue . . . , rather than filing a general denial" (Dkt. #31 at p. 8). Even though QIC did not mention the forum selection clause in the Motion to Dismiss, its arguments were consistent with enforcement of the clause. Moreover, QIC filed its reply seeking to enforce the forum selection clause just over two months after Provitas filed its complaint (Dkt. #31 at p. 8). Such conduct cannot reasonably be deemed inconsistent with the intent to enforce the right.

Second, QIC has not "invoke[d] the judicial process." *Mirant*, 613 F.3d at 589. QIC has urged at every point in the litigation that the case be dismissed or transferred to the District of Minnesota. At no turn has QIC sought a decision on the merits of this case from this Court. In fact, it has filed "a mere 'perfunctory motion to dismiss'"—conduct that the Fifth Circuit has not considered a substantial invocation of the judicial process. *Id.* (quoting *Cigna*, 56 F.3d at 661).

Consequently, QIC has not caused Provitas to suffer detriment or prejudice through the judicial process. Any detriment or prejudice Provitas suffers now is the result of its own invocation of the judicial process.

Provitas also argues that QIC procedurally waived the forum selection clause argument. Provitas correctly contends that QIC "makes no mention of the forum selection clause" until its reply brief (Dkt. #30 at p. 5). Thus, Provitas asserts that both the Fifth Circuit's practice and this Court's Local Rules preclude this Court's consideration of the forum selection clause argument (Dkt. #30). QIC claims it did not raise an entirely new argument in its reply brief because Provitas attached the Agreement as an exhibit to its Response to the Motion to Dismiss (Dkt. #13). For this, QIC claims its forum selection clause argument was within the scope of the response. QIC also argues that, even if the forum selection clause was an entirely new argument, Provitas had the opportunity to respond, so this Court should still consider it (Dkt. #31).

As mentioned, "[t]he court generally does not hear arguments asserted for the first time in a movant's reply brief, in order to avoid unfair surprise to the nonmovant." *Dean*, 2013 WL 2452673. But when "the movant responds to that issue in the reply," the court has discretion to consider the argument. *Id.* (citing *Ramirez,* 557 F.3d at 203). The Court chooses to exercise that discretion here. Provitas had the "meaningful opportunity to respond" to QIC's forum selection clause argument, and, as discussed below, the Court accounted for those arguments in its analysis of the clause. *Jackson v. Dall. Cnty. Juvenile Prob. Dep't*, No. 3:06-CV-264-M, 2007 WL 2187250, at *4 (N.D. Tex. July 30, 2007).

Further, QIC insists that to the extent its Motion to Dismiss is not granted, QIC "intends to file a Motion to Dismiss based solely on the forum selection clause and choice of law provision" (Dkt. #31 at p. 7). Thus, although Provitas "urge[s] the Court to strike the arguments in the Reply

brief, the more expedient course is" for the Court to exercise its discretion to consider the argument at this stage. *White v. City of Red Oak, Tex.*, No. 3:13-CV-4477-P, 2014 WL 11460871, at *1 (N.D. Tex. July 31, 2014). "This will hopefully expedite consideration of the pending motions by avoiding another full round of briefing on an inevitable future motion to [dismiss]." *Id.*

Accordingly, the Court will consider the mandatory nature, applicability, and enforceability of the forum selection clause.

### C. Mandatory Nature, Applicability, and Enforceability of the Forum Selection Clause

Before the Court may weigh the public interest factors in the forum selection clause § 1404(a) analysis, the Court must determine that the forum selection clause at issue is both mandatory and enforceable. *Sabal Ltd. LP*, 209 F. Supp. 3d at 916. While federal law governs the enforceability of a forum selection clause, *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997), "the question of enforceability is analytically distinct from the issue of interpretation: [o]nly after the court has interpreted the contract to determine whether it is mandatory or permissive does its enforceability come into play." *Weber*, 811 F.3d at 770.

The Court finds that, under the applicable law, the forum selection clause contained in the parties' Agreement is both mandatory and enforceable. The Court discusses each point in turn.

### 1. Whether the Forum Selection Clause in the Agreement is Mandatory or Permissive

The Court must determine whether the forum selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *accord Caldas & Sons*, 17 F.3d at 127. "For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the

parties' intent to make that jurisdiction exclusive." *New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974)); *see also Weber*, 811 F.3d at 768 (holding that a forum selection clause is mandatory only if it contains clear language specifying that litigation must occur in the specified forum. "[L]anguage merely indicating that the courts of a particular place shall have jurisdiction (or similar) is insufficient to make a[] [forum selection clause] mandatory.").

Although enforceability of a forum selection clause is analyzed under federal law, where there exist both valid forum selection and choice of law clauses, the substantive law identified in the choice of law clause governs interpretation of the forum selection clause. *See Atl. Marine*, 571 U.S. at 62 (observing that lower court "erred in failing to make the adjustments required" because "the transfer motion [was] premised on a forum-selection clause"); *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("[C]ourts must apply the law contractually chosen by the parties to interpret the [forum selection] clause."). However, a court sitting in diversity applies the forum's choice of law rules to determine what substantive law should guide the court's interpretation of the forum selection clause. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97 (1941).[5] To be sure, "the presence or absence of a specific choice-of-law clause does not alter the core obligation of a federal court, sitting in diversity, to ascertain which body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction." *Weber*, 811 F.3d at 770–71. This action was brought in a Texas federal court, so under *Klaxon*, Texas choice of law rules apply. "Texas law gives effect to choice of law clauses regarding construction of a contract."

---

[5] In *Weber*, the Fifth Circuit indicated that neither it, nor the "sister circuits appear to have hewn closely to this principle in interpreting forum selection clauses. The courts have interpreted forum selection clauses according to general common-law contract principles without addressing the precise source of that law." 811 F.3d 758 at 770. It reasoned "[t]he use of this general-law approach may be because, in this circuit and others, the enforceability of a [forum selection clause] is governed by federal law." *Id.*

*Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) (citing *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002)).

The parties negotiated a choice of law clause in their Agreement. It states that "the relationship of the parties hereunder shall be governed by the laws of the State of Minnesota" (Dkt. #13 Ex. A-1 ¶ 12). Because Texas choice of law rules give effect to choice of law clauses, such as the clause included in this Agreement, the Court will apply Minnesota substantive law to interpret the contract.

Under Minnesota law, "the primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When a contract is unambiguous, the "language must be given its plain and ordinary meaning." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted). A contract is ambiguous only when its terms are "susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). "The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (internal citations omitted).

Minnesota law provides further guidance to courts interpreting contracts. Specifically, "courts should 'construe a contract as a whole'" and "'attempt to avoid an interpretation of the contract that would render a provision meaningless.'" *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754–55 (8th Cir. 2018) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990)). Additionally, "[w]here there is an apparent conflict between two clauses or provisions of a contract, it is the court's duty to find harmony between them and to reconcile them if

possible." *Id.* at 755 (quoting *Nat'l City Bank v. Engler*, 777 N.W.2d 762, 765 (Minn. Ct. App. 2010)).

> The forum selection clause in the Agreement between QIC and Provitas reads:
>
> any claim, cause of action, suit or demand allegedly arising out of or related to this Agreement, or the relationship of the parties, shall be brought exclusively in Minnesota District Court or United States Federal District Court located in Minneapolis, Minnesota U.S.A., and the parties irrevocably consent to the exclusive jurisdiction and venue of such courts and waive any objections they may have at any time to such exclusive jurisdiction and venue.

(Dkt. #13 Ex. A-1 ¶ 12).[6] QIC argues that the forum selection clause is "undoubtedly mandatory" given the words "shall" and "exclusively" (Dkt. #14 at pp. 7–8). Further, QIC asserts Provitas cannot circumvent such language because the clause also provides for the parties' "irrevocabl[e] consent" (Dkt. #14 at pp. 7–8). Provitas does not, and cannot, argue that the language in the forum selection clause is anything but mandatory. Instead, Provitas contends the clause is an "unambiguously inapplicable" "red herring" in this particular lawsuit (Dkt. #17 ¶¶ 6, 14). The Court will address applicability of the forum selection clause below, in accordance with the enforceability framework.

But, because the exclusive language in this provision is unambiguous, the Court finds that, if the forum selection clause is applicable and legally enforceable, the forum selection clause is also mandatory in this suit.

### 2.  Applicability of the Forum Selection Clause

When the forum selection clause is mandatory, the court must also determine whether the

---

[6] The forum selection clause carved out an exception for equitable relief: "Notwithstanding the foregoing, in the event of any breach or threatened breach of this Agreement injunctive or equitable relief may be sought from any court having equity jurisdiction" (Dkt. #13 Ex. A-1 ¶ 12). Because Provitas does not seek equitable relief, this clause is not at issue.

causes of action at issue arise under the forum selection clause.[7] *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998)). To make this determination, the court interprets the forum selection clause to evaluate its applicability to the instant dispute. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 304 (5th Cir. 2016). Again, because this Agreement contains a choice of law provision, the Court will apply Minnesota substantive law to interpret the contract. As previously stated, regarding the interpretation of contracts, Minnesota law prioritizes the plain meaning of the text, the parties' intentions, and the context of the contract in its entirety.

Provitas contends that the Agreement containing the forum selection clause applies only to issues of confidentiality between the parties, and points to the title of the Agreement itself—that is, the "Mutual Confidentiality Agreement" (Dkt. #17 ¶¶ 2–6). It also highlights portions of the recitals that indicate the parties would enter subsequent agreements termed the "Transactions" (Dkt. #17 ¶¶ 2–4). For this, Provitas argues that the current suit does not arise out of or relate to issues of confidentiality, and therefore, QIC's entire argument rests "on the idea that the present dispute is based on the 'relationship of the parties'" (Dkt. #17 ¶¶ 2–4); (Dkt. #13 Ex. A-1 ¶ 12). Additionally, Provitas asserts that this dispute is not connected to the relationship of the parties because the Agreement describes the relationship as one between "Disclosing Party" and "Recipient" of confidential information, which is not at issue in this case (Dkt. #17 ¶ 4). Consequently, Provitas claims the forum selection clause is inapplicable (Dkt. #17 ¶ 4).

QIC argues that this dispute does involve the relationship of the parties (Dkt. #14 at p. 9). It cites to a Minnesota Court of Appeals decision regarding a contract with a forum selection clause

---

[7] In the typical analysis, courts consider applicability after enforceability. *See Ginter*, 536 F.3d at 441–45. Here, however, Minnesota law applies to determine whether the forum selection clause is mandatory and whether it is applicable, whereas federal law applies to determine its enforceability. The Court, therefore, adjusted the organization of its analysis for clarity as to which law applies.

covering that "Agreement and any claim related directly or indirectly to th[at] Agreement." *Gander Mountain Co. v. Lazard Middle Mkt., LLC*, No. A11-221, 2012 WL 118236 at *3 (Minn. Ct. App. Jan. 17, 2012). The court found that the claims were "at least indirectly related to . . . the relationship between the parties created by the contract." *Id.* Further, QIC contends that "[t]he intent of the parties in the Agreement" was to litigate exclusively in the District of Minnesota "any suit relating to the relationship of Provitas and QIC" (Dkt. #14 at p. 9).

The Court finds that the language in the forum selection clause is unambiguous. The current suit arises out of and relates to the relationship between the parties. The business relationship between Provitas and QIC would not exist without the initial Agreement, which by its text subjects Provitas and QIC to all of the terms within the Agreement should they "enter into any [subsequent] Transactions" (Dkt. #13 Ex. A-1 ¶ C). The relationship between the parties, therefore, is not limited to issues of confidentiality. To be sure, Provitas' reading of the clause "relationship between the parties" would render that clause superfluous. If the "relationship" was limited to the parties as "Disclosing Party" and "Recipient," the first portion of the forum selection clause would be of sufficient scope because the "claim, cause of action, suit or demand" would "allegedly aris[e] out of or relat[e] to" the Agreement (Dkt. #13 Ex. A-1 ¶ 12). As mentioned, Minnesota law directs that courts "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Qwinstar*, 882 F.3d at 754–55 (quoting *Chergosky*, 463 N.W.2d at 525 (internal quotations omitted)).

In addition to the forum selection clause itself, there are other textual phrases that support application of the forum selection clause in this matter. First, the text of the forum selection clause is broad. It indicates that "*any* claim, cause of action, suit or demand allegedly *arising out of* or *related to* this Agreement, or the *relationship of the parties*, shall be brought exclusively in

Minnesota District Court" (Dkt. #13 Ex. A-1 ¶ 12) (emphasis added). Second, the recitals contain a provision demanding that "[e]ach party's willingness to . . . enter into any Transaction is conditional upon and subject to the terms of this Agreement" (Dkt. #13 Ex. A-1 ¶ C). Third, the recitals do not limit the relationship between Provitas and QIC as strictly as Provitas contends. The Agreement states that Provitas "has indicated an interest in exploring a *relationship* with QIC and potentially entering into . . . 'Transactions'" (Dkt. #13 Ex. A-1 ¶ A) (emphasis added). The relationship, therefore, would be further defined in the subsequent Transactions, which, as noted above, are "conditional upon and subject to the terms" of the Agreement containing the forum selection clause (Dkt. #13 Ex. A-1 ¶¶ A, C, 12).

Though few cases exist in which Minnesota courts have interpreted contracts concerning the language at issue here, some cases are instructive, and their reasoning supports application of the forum selection clause in this case. As QIC argued, the court in *Gander Mountain Co.* concluded that a forum selection clause was "of sufficient breadth to cover claims associated with the relationship of the parties created under" multiple agreements. 2012 WL 118236 at *3.

The court in *Knutson v. Rexair, Inc.* interpreted a forum selection clause in a distributor agreement that covered "[a]ny cause of action, claim, suit or demand by [Plaintiff], allegedly arising from or related to the terms of this agreement or the relationship of the parties." 749 F. Supp. 214, 215 (D. Minn. 1990). Though the plaintiff argued that his claim did "not arise out of the 'relationship of the parties' as that term [was] defined in the distributor agreement[8]," the court

---

[8] The initial agreement provided that:

> The relationship between Rexair and Distributor during the term of this agreement will be that of vendor and vendee. Distributor is not the agent or representative of Rexair for any purpose whatsoever and is not granted under this agreement or otherwise any express or implied authority to assume or create any obligation or responsibility on behalf of or in the name of Rexair or to bind Rexair in any manner or thing whatsoever.

*Id.* at 217.

found that "[p]lainly, the provision [was] not definitional and was not intended to be applied in construing the forum selection clause." *Id.* at 216–17. The court also reasoned that, even though the claim at issue did not pertain directly to the relationship expressly discussed in the distributor agreement, "the distributor agreement at issue incorporate[d] the terms of" subsequent agreements." *Id.* at 217. [9] Further, "the plaintiff's claim ar[ose] directly from the parties' business relationship. This relationship [was] evidenced by the distributor agreement, and the forum selection clause [was] drafted in sufficiently broad terms to apply to plaintiff's claim." *Id.*

The forum selection clause here features language that is similarly broad and a relationship also established by an initial Agreement and built upon in subsequent agreements. The forum selection clause covers "any claim" that even "allegedly arises out of or relates to the Agreement" (Dkt. #13 Ex. A-1 ¶ 12). The drafters then extended the coverage further, using the disjunctive "or" rather than the conjunctive "and" (Dkt. #13 Ex. A-1 ¶ 12). Specifically, the forum selection clause would also apply to "any claim" that "allegedly relates to . . . the relationship of the parties" (Dkt. #13 Ex. A-1 ¶ 12). This language, combined with the language in the recitals rendering any subsequent Transaction "conditional upon and subject to the terms of" the initial Agreement,

---

[9] The court in *Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.* also found claims were governed by a forum selection clause that was included in an initial agreement but not in a subsequent agreement. 646 N.W.2d 904, 908 (Minn. Ct. App. 2002). In that case, the language of the forum-selection clause covered "any dispute or controversy between the parties [that] arises out of or is related to this Authorization, and/or performance or termination thereof." *Id.* The appellant argued that its claims arose out of a subsequent agreement, rather than the "Authorization." The court disagreed, reasoning:

> The Authorization created and defined the parties' entire business relationship by authorizing appellant to resell [appellee's] products. . . . In particular, appellant's claims are based on a right to resell [appellee's] products exclusively to certain customers—a right bargained for in the [subsequent agreement]. But this exclusive right could not exist without the basic right to resell [appellee's] products as granted in the Authorization. Because appellant's claims based on the Account Agreement amount to a dispute based on appellant's right to resell [appellee's] products, appellant's claims arise out of and relate to the Authorization and are thus governed by the forum-selection clause.

*Id.*

illustrates an intent for the forum selection clause to cover actions that involve the business relationship between QIC and Provitas. The claims here involve such a relationship.

Comparatively, the court in *Express Diagnostics, Inc. v. Phamatech, Inc.* found a forum selection clause did not apply. No. A13-2156, 2014 WL 4056031 at *1 (Minn. Ct. App. Aug. 18, 2014). In its interpretative analysis, the court specifically reasoned the clause did not apply because "[n]either agreement referred to the other" nor included "a merger clause or stated that it represented the entire relationship between the parties." *Id.* Here, the parties did reference subsequent agreements in the initial Agreement and, notably, rendered those subsequent agreements "conditional upon and subject to the terms" of the initial Agreement" (Dkt. #13 Ex. A-1 ¶ C).

Given the text of the Agreement, the apparent intent of the parties, and the instructive Minnesota case law, the Court interprets the Agreement's forum selection clause to apply in this dispute.

### 3. Enforceability of the Agreement's Forum Selection Clause

Lasty, the court must decide whether the forum selection clause is enforceable. "We begin with federal law, not state law, to determine the enforceability of a forum-selection clause. Under federal law, forum-selection clauses are presumed enforceable, and the party resisting enforcement bears a 'heavy burden of proof.'" *Ginter*, 536 F.3d at 441 (quoting *Haynsworth*, 121 F.3d at 961. "[F]ederal law applies . . . in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974)); see also *Stewart*, 487 U.S. at 32 ("Federal law also governs district courts' decisions "whether to give effect to the parties' forum-selection clause."). Under federal law, forum selection clauses "are prima facie valid and should be enforced unless enforcement is

shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).

Here, QIC asserts "there is nothing to suggest [it] used fraud or overreaching to secure the forum selection clause between two business-savvy parties" (Dkt. #14 at p. 8). Again, Provitas does not dispute this point. The Court, therefore, finds no reason the forum selection clause should be deemed unreasonable. Accordingly, the forum selection clause is enforceable.

### D. Section 1404 Factors

Having found the forum selection clause in the Agreement is mandatory, applicable, and enforceable, the Court now turns to weigh the public interest factors in the altered forum selection clause § 1404(a) analysis. As discussed, "when parties have contracted in advance to litigate disputes in a particular forum," district courts should adjust their usual § 1404(a) analysis in three ways so as not to "not unnecessarily disrupt the parties' settled expectations." *Atl. Marine*, 571 U.S. at 66–67.

First, the plaintiff's choice of forum "merits no weight"; rather, the plaintiff has the burden of establishing that § 1404(a) transfer is unwarranted. *Id.* at 66–67. Second, the court will not consider the private-interest factors. Because the parties have contracted for a specific forum, they "waive the right to challenge the preselected forum as inconvenient." *Id.* at 64. Instead, the court considers only the public-interest factors. *Id.* The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the interest in having localized issues decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.* Importantly, because these "factors will rarely defeat a transfer motion, the practical result is that forum selection clauses should control except in unusual cases." *Id.*

32

Provitas has not established that a § 1404 transfer is unwarranted nor that this is an unusual case in which the public factors defeat the motion to transfer. Rather, the Court finds that the facts of this case favor adjudication in Minnesota.

### 1.   Provitas' Burden to Establish that Transfer is Unwarranted

Provitas does not show that transfer of this case to Minnesota is unwarranted. In fact, it showed just the opposite in its cases before the Districts of New Jersey and Minnesota involving this exact dispute and the same three parties—Provitas, QIC, and DSM (Dkt. #8 Ex. 9 at pp. 22–33); (Dkt. #8 Ex. 2 ¶ 8).[10] DSM sued Provitas in the District of New Jersey. In its Motion to Dismiss, Provitas asserted that the "'substantial part of the events' giving rise to [the] claims arose in Minnesota where the product was manufactured, packaged, and labeled" (Dkt. #8 Ex. 9 at p. 27). It further argued that the "vast majority of the evidence, including the QIC witnesses who manufactured, packaged, labeled, and shipped the subject product are located in Minnesota" (Dkt. #8 Ex. 9 at p. 27). For these reasons, Provitas argued "the action should be venued in the Federal District Court for the District of Minnesota" (Dkt. #8 Ex. 9 at p. 27). Additionally, in the case before the District of Minnesota, Provitas declared the District of Minnesota as the "judicial district [] where the substantial part of the events or omissions giving rise to the claim occurred, specifically the acts and omissions of QIC in its production and packaging of the subject product in its facility located in the State of Minnesota" (Dkt. #8 Ex. 2 ¶ 8).

The Court recognizes the case in the District of New Jersey is not identical to that before the Court here. In the New Jersey case, DSM was situated as the plaintiff and Provitas the defendant, and DSM arguably had less connection to the Eastern District of Texas than QIC maintains (Dkt. #17 ¶ 13). But the relative position of the parties does not change the fact that a

---

[10] The Court may consider these documents because it is not limited to the complaint for venue purposes. *Ambraco*, 570 F.3d at 238.

"substantial part of the events giving rise to the claims" in this case "arose in Minnesota" and that "the vast majority of the evidence" remains there (Dkt. #8 Ex. 9 at p. 27). As Provitas stated, "the [subject] product was manufactured, packaged, and labeled" in Minnesota where "the QIC witnesses who manufactured, packaged, labeled, and shipped the subject product are" also located (Dkt. #8 Ex. 9 at p. 27).

In this case, each of those statements remains true. The product at issue "was manufactured, packaged, and labeled" in Minnesota where "the QIC witnesses who manufactured, packaged, labeled, and shipped the subject product are" also located (Dkt. #8 Ex. 9 at p. 27). That some witnesses for Provitas live in Texas does not change the fact that a "substantial part of the events giving rise to the claims" in this case "arose in Minnesota" or that "the vast majority of the evidence" remains there (Dkt. #8 Ex. 9 at p. 27). Accordingly, Provitas has not met its burden of showing that transfer of this case to Minnesota is unwarranted.

### 2. The Public Factors

Likewise, the public factors do not weigh in favor of or against transfer to the District of Minnesota—they are neutral. First, the administrative difficulties flowing from court congestion are neutral. In considering this factor, the speed with which a case can come to trial and be resolved may be relevant. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 316 (5th Cir. 2008); *Gates Learjet Corp. v. Jenson*, 743 F.2d 1325, 1337 (9th Cir. 1984). In 2020, the District of Minnesota had 2,993 cased filed and seven active district judges. https://www.uscourts.gov/statistics-reports/us-district-courts-judicial-business-2020. The Eastern District of Texas had 4,249 cases filed and eight active district judges. *Id.* Though federal courts across the country face congested dockets, the Eastern District of Texas maintains a heavier case load than the District of Minnesota. Conversely, the most recent statistics obtained by the Court for the twelve-month period ending

on September 30, 2020 indicate that the median time from filing to disposition in civil cases was 8.9 months in the Eastern District of Texas and 14.3 months in the District of Minnesota. https://www.uscourts.gov/statistics-reports/judicial-business-2020-tables.   Notably, in that same time frame, the Eastern District of Texas completed 22 trials, whereas the District of Minnesota completed just six. *Id.* Thus, this factor is neutral, as the congestion in the Eastern District of Texas is greater than that of the District of Minnesota, but the time frame for disposition in the Eastern District of Texas appears to be shorter.

Next, the Court finds that the interest in having localized issues decided at home is a neutral factor. Provitas argues that QIC must be "held accountable for its failures to abide by proper manufacturing standards for a food product it shipped to Texas, for a Texas-business to then sell to its customers" (Dkt. #13 ¶ 53). Accordingly, Provitas claims the "lawsuit is for the benefit of a Texas business and its customers" (Dkt. #13 ¶ 53). However, an argument with equal cogency can be made for dispute-resolution in Minnesota. QIC is a Minnesota based company that allegedly created a product that should have been vegan but was actually contaminated with animal products (Dkt. #1). The alleged contamination occurred at its facility in Minnesota (Dkt. #1). Minnesota businesses and QIC customers in Minnesota have an interest in holding accountable their home-based companies. Thus, this factor is neutral.

The latter two factors are also neutral. While the Court today does not engage in a choice of law analysis to determine whether Texas or Minnesota law will govern the merits of this case, the Court finds that in either circumstance, the District of Minnesota, as a federal court, is well-suited to deal in either area of law. Just as this Court applied Minnesota substantive law to interpret the Agreement, the District of Minnesota can apply Texas law, should it determine Texas law will govern the matter. The Court also recognizes that the District of Minnesota has already adjudicated

35

a similar matter involving Provitas, QIC, and DSM (Dkt. #8 Ex. 2), so it would certainly be capable of adjudicating this dispute.

Consequently, the public factors cut neither for nor against transfer of this case to the District of Minnesota. As discussed, only in unusual cases will the public factors defeat the motion to transfer when there is a valid, enforceable forum selection clause. Because a valid forum selection clause exists and the public factors are largely neutral here, this is not one of those unusual cases.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss (Dkt. #16) is **DENIED** and Defendant's Motion to Transfer to the District of Minnesota (Dkt. #16) is hereby **GRANTED.**

It is therefore **ORDERED** that this case is transferred to the United States District Court for the District of Minnesota.

**IT IS SO ORDERED.**
 **SIGNED this 14th day of December, 2021.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE